1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CASEY WILKERSON,<br><br>             Plaintiff,<br><br>        v.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of the Social<br>Security Administration,<br><br>           Defendant. | NO. EDCV 10-01940-SS<br><br>**MEMORANDUM DECISION AND ORDER** |

**I.**

**INTRODUCTION**

Plaintiff Casey Wilkerson ("Plaintiff") brings this action seeking to overturn the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner" or the "Agency") denying Plaintiff's application for Social Security Income benefits ("SSI"). The parties consented to the jurisdiction of the undersigned United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c). For the reasons stated below, the decision of the Agency is AFFIRMED.

## II.

### PROCEDURAL HISTORY

Plaintiff filed an SSI application on May 5, 2009, alleging a disability onset of June 1, 2008, due to depression and borderline personality disorder. (Administrative Record ("AR") 102-04, 111). The Agency denied Plaintiff's claim on June 15, 2009, as well as at the reconsideration level on September 18, 2009.  (AR 46-57).

On October 20, 2009, Plaintiff requested a hearing before an Administrative Law Judge (the "ALJ"), which was held on June 17, 2010. (AR 17-43, 60).  On October 27, 2010, the ALJ issued an unfavorable decision. (AR 9-16).  Plaintiff appealed the ALJ's decision on November 11, 2010.  (AR 4).  The Appeals Council denied Plaintiff's request for review and the ALJ's decision became the final decision of the Commissioner.  (AR 1-3).  Plaintiff's Complaint, filed on December 29, 2010, seeks review of Defendant's decision denying disability benefits.

## III.

### FACTUAL BACKGROUND

Plaintiff was born on March 15, 1988, was twenty-one (21) when he filed his SSI application, and has a limited education.  (AR 20, 165). Prior to the onset of the alleged impairments, Plaintiff worked as a laborer for a roofing business two or three days per week.  (AR 112). Plaintiff asserts that he is disabled due to his mental impairments. (AR 27, 111).  The ALJ found that claimant has the following severe

impairments:  mood  disorder,  marijuana  dependence,  and  alcohol
dependance.  (AR 11).

A. <u>**Plaintiff's Mental Health History**</u>

    **1. Dr. Andrew Janik, Treating Physician**

    Plaintiff was a patient of Dr. Andrew Janik from April 2009 until
March 2010. (AR 234, 247). Plaintiff testified that he usually saw Dr.
Janik "[o]nce every month." (AR 24).  In a case record report from
April 20, 2009, Dr. Janik diagnosed Plaintiff with mood disorder not
otherwise  specified  ("NOS"),  polysubstance  abuse,  and  personality
disorder. (AR 253). Plaintiff's GAF score was 50. (<u>Id.</u>). Dr. Janik
noted that Plaintiff "blows up," but denies suicidal ideations. (AR
255-56). Dr. Janik stated that "therapy [was] encouraged." (AR 253).
Dr. Janik reported positive heroin use and indicated usage of various
other illegal drugs. (AR 255). Dr. Janik also stated that Plaintiff's
last use of a street drug was cocaine six months prior. (<u>Id.</u>). Dr.
Janik noted that Plaintiff sporadically drank alcohol, and was not in
a drug rehabilitation program. (<u>Id.</u>).

    In a case record report from May 19, 2009, Dr. Janik again reported
that Plaintiff had no suicidal ideations, but that Plaintiff was "[n]ot
going to therapy." (AR 252). On June 16, 2009 Plaintiff asked for a
therapist, and Dr. Janik gave Plaintiff a referral. (AR 251). Dr.
Janik noted that Plaintiff "still smokes weed" and "needs [to] stop
drugs." (<u>Id.</u>). On August 11, 2009, Dr. Janik reported that Plaintiff
"[said that he] can't afford therapy." (AR 250). Dr. Janik also noted

that Plaintiff's behavior was indicative of "O.C.D." because "[Plaintiff] has to over clean, if something drops[,] [he] has to [indecipherable] it 3 times. Lots of things - X2." (Id.). In addition, Dr. Janik stated that Plaintiff "denie[d] all marijuana - [and Plaintiff] was getting more nervous." (Id). On September 29, 2009 Dr. Janik reported that Plaintiff showed signs of OCD, but that "[Plaintiff did not] want to address it." (AR 249). Dr. Janik noted that otherwise Plaintiff was "stable" with no suicidal ideations. (Id.). On January 24, 2009 Plaintiff reported "still feeling very angry" and "[c]laim[ed] [to be] off marijuana." (AR 248). "[Plaintiff said that he] stays home [and] does (sic) [the] computer." (Id.). Dr. Janik also noted that Plaintiff "[r]efuses med [change]" and was "[n]ot even going to therapy." (Id.). Plaintiff again reported no suicidal ideations. (Id.). As of March 22, 2010, Dr. Janik reported that Plaintiff "still" had "[n]o other treatment." (AR 247). Plaintiff again "denie[d] [marijuana and] other drugs" and continued to have no suicidal ideations. (Id.).

On November 24, 2009 Dr. Janik completed a "Work Capacity Evaluation" for mental impairments. In his evaluation, Dr. Janik reported that Plaintiff had serious limitations in his ability to work and would be anticipated to be absent from work three or more days per month due to his impairments and treatment. (AR 244-45).

Dr. Janik also administered a self-rating test and a mood disorder questionnaire to Plaintiff. (AR 257-260). Plaintiff indicated that his mood caused him "moderate problem[s]." (AR 257-260).
//

4

**2. Robin Rhodes Campbell, Ph.D., Consultative Licensed Clinical Psychologist**

On August 18, 2010 Dr. Robin Rhodes Campbell examined Plaintiff and submitted a complete psychological evaluation.  (AR 276-287).  Dr. Campbell reviewed Plaintiff's medication records and reported that "[Plaintiff] reports [that] he has difficulty with concentration and memory." (AR 277).  Dr. Campbell noted that "[u]pon query, it did not appear that [Plaintiff] is experiencing psychotic symptoms, but [he] has some intrusive thoughts." (Id.).  Dr. Campbell stated that "[Plaintiff] report[ed] depression and substance abuse" and "drinks alcohol nightly to help him sleep."  (Id.).  Dr. Campbell reported that Plaintiff "currently takes Lamotrigine [and Plaintiff stated that] the medication has been beneficial." (Id.).

In terms of Plaintiff's current level of functioning, Dr. Campbell noted that "[Plaintiff] is able to do household chores, run errands, shop, cook, dress and bathe himself. [Plaintiff] does not drive. [Plaintiff] enjoys swimming and drawing." (AR 278).  "In the morning, [Plaintiff] will smoke a cigarette, go swimming, watch television and take a nap." (AR 278-79). "In the afternoon, [Plaintiff] will eat. [Plaintiff] will play with his dog and feed his lizard.  In the evening, [Plaintiff] is not sure what his routine is." (AR 279).  Dr. Campbell noted that "[t]here was nothing usual about [Plaintiff's] posture, bearing, manner, or hygiene." (Id.).  Dr. Campbell reported that while "[Plaintiff's] mood was described as 'irritated,' . . . [Plaintiff's] [a]ffect was within normal limits with an adequate range." (Id.).  Dr. Campbell found that "[Plaintiff's] thought processes were linear and

1  goal-directed with no loosening of associations, flight of ideas, racing
2  thoughts, thought blocking, thought insertion, withdrawal or
3  broadcasting." (Id.). Further, Dr. Campbell noted that "[Plaintiff]
4  exhibited no evidence of auditory or visual hallucinations, delusions,
5  or illusions. There were no obsessions, compulsions, or paranoia.
6  [Plaintiff] denied current suicidal or homicidal ideation, plan or
7  intent." (Id.) Dr. Campbell stated that "[Plaintiff] was alert and
8  oriented to person, place, time, and situation. [Plaintiff] did not
9  present with obvious cognitive delays." (Id.). In terms of Plaintiff's
10 ability to concentrate, Dr. Campbell stated that "[Plaintiff's]
11 attention was unimpaired" and "[Plaintiff's] concentration was adequate
12 for conversation and time-limited assessment tasks." (Id.). In
13 addition, Dr. Campbell found that "[Plaintiff's] insight and judgment
14 were good. [Plaintiff] demonstrated no impairment in social and common
15 sense understanding." (Id.).

16

17         Dr. Campbell administered the Wechsler Adult Intelligence Scale
18 test (WAIS-IV), the Wechsler Memory Scale test, the Bender Gestalt
19 Visual Motor Test II, the Trail-Making test, the Rey 15-Item Memory
20 test, the test of memory malingering, the Minnesota Multiphasic
21 Personality Inventory test, and diagnosed Plaintiff using the DSM-IV.
22 (AR 280-83). Dr. Campbell noted that her "test results should be
23 interpreted cautiously given the [Plaintiff's] poor effort." (AR 279).
24 The Wechsler Memory Scale test was aborted "due to [Plaintiff's] lack
25 of motivation." (AR 281). Dr. Campbell reported that:

26

27         Current test result indicate that [Plaintiff was] functioning
28         in the borderline range. However, given [Plaintiff's] poor

effort on the testing procedures, [the results are] unlikely
to be an accurate representation of the [Plaintiff's] current
cognitive and psychological functioning.  [Plaintiff] scored
very poorly on the measure of memory; however, his effort on
this task was minimal.  On a neurological screening
instrument, [Plaintiff] scored as impaired in terms of his
perceptual ability and unimpaired in terms of his motor
functioning.  On a second neurological screening instrument,
[Plaintiff] also scored as impaired.  On the Measure of
Memory Malingering, [Plaintiff] scored as malingering memory
deficits.  [Plaintiff's] MMPI-2 profile is invalid and
uninterpretable.  [Plaintiff's] validity profile was
consistent with exaggeration or feigning of psychiatric
symptoms or also potentially a measure of his objective
distress and could also be interpreted as 'a cry for help.'

(AR 282).  Dr. Campbell diagnosed Plaintiff with cannabis dependence and
mood disorder.  (AR 283).  Dr. Campbell further reported that:

Based on the current findings, the [Plaintiff's] current test
results are invalid in regard to his intellectual memory
functioning.  It is not possible at this time to ascertain
the degree to which [Plaintiff] has psychiatric symptoms that
would interfere with his ability to understand, remember and
carry out detailed instructions. [Plaintiff] did not appear

\\
\\

1         to be giving tasks his best effort. Based upon
2         [Plaintiff's] history, [Plaintiff] does have some mood
3         instability as well as probable substance dependence.

5 (AR 283). Dr. Campbell made the following conclusion:

7         [Plaintiff] would have no impairment in understanding,
8         remembering, and carrying out short, simple instructions. In
9         addition, [Plaintiff's] ability to understand, remember, and
10         carry out detailed instructions would be unimpaired.
11         [Plaintiff] would be unimpaired in his ability to make
12         judgment on simple, work-related decisions. [Plaintiff] may
13         have moderate-to-marked difficulty in relating appropriately
14         to the public, supervisors, and co-workers. [Plaintiff's]
15         ability to withstand the stress and changes associated with
16         an eight-hour workday and day-to-day work activities is
17         mildly to moderately impaired.

19 (AR 283). Dr. Campbell also noted that "[Plaintiff] does not appear to
20 be able to appropriately handle funds in his own best interest due to
21 ongoing substance abuse." (Id.). Dr. Campbell reported that
22 "[Plaintiff] drinks a case of alcohol a week," "uses marijuana daily,"
23 and "last used methamphetamines six months ago and cocaine two years
24 ago." (AR 278). "[Plaintiff] last used heroin and PCP." (Id.). Dr.
25 Campbell stated that "[Plaintiff] has good physical health" and "[t]here
26 was no report of head injury or loss of consciousness." (Id.).
27 \\
28

**3. Dr. R. Paxton, Medical Consultant**

In a July 11, 2009 Mental Residual Function Capacity Assessment, Dr. R. Paxton indicated that Plaintiff's ability to understand and remember very short and simple instructions was not significantly limited, while Plaintiff's ability to understand and remember detailed instructions was moderately limited. (AR 214). Dr. Paxton also noted that while Plaintiff's ability to carry out very short and simple instructions was not significantly limited, Plaintiff's ability to carry out detailed instructions was moderately limited. (Id.) Dr. Paxton noted that Plaintiff is not significantly limited in his ability to maintain attention and concentration for extended periods, to sustain an ordinary routine without special supervision, and to work in coordination with or proximity to others without being distracted by them. (Id.)

Dr. Paxton also noted that Plaintiff is moderately limited in his ability to interact appropriately with the general public, but is not significantly limited in his ability to accept instructions and respond appropriately to criticism from supervisors or to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (AR 215). In his functional capacity assessment, Dr. Paxton stated that "[Plaintiff] is able to understand and remember simple but not detailed tasks[;] [Plaintiff] is able to maintain concentration, pace and persistence over a normal work day and work week[;] [Plaintiff] should have limited public contact[;] and [Plaintiff] is able to adapt to normal work environment and situations."

9

(AR 216).  Dr. Paxton concluded that an RFC assessment was necessary. (AR 217).

**4.   Hospitalization**

The Desert Regional Medical Center admitted Plaintiff on February 25, 2009 on a 5150 hold.[1]  (AR 176-179).  After an altercation with his father and brother, Plaintiff "pretended to take an overdose of [his] medications and state[ed] that he did not want[] to live anymore."  (AR 177).  "[Plaintiff] reports [that] he actually threw the medication in his room[,] [but] [h]e does admit to going to friend (Derek's) house to look for Derek's father's gun."  (AR 184).  In a hospital report "[Plaintiff] admitt[ed] that he easily becomes enraged and often has suicidal thoughts."  (AR 177).  The Emergency Department Record noted Plaintiff's use of marijuana.  (AR 184, 189).

Plaintiff was transferred to Aurora Charter Oak Hospital for a 72-hour hold.  (AR 205).  A February 26, 2009 mental status exam revealed "[Plaintiff's] orientation and memory to be adequate."  (Id.). Plaintiff's February 28, 2009 discharge summary stated that he "does use marijuana, and his urine drug screen was positive for it."  (Id.).  The summary also indicated that Plaintiff had "[i]mproved."  (AR 206). Plaintiff's discharge diagnosis indicated bipolar disorder and

---

[1]  Under California Welfare and Institutions Code § 5150, "[w]hen any person, as a result of mental disorder, is a danger to others, or to himself or herself, or gravely disabled, a peace officer . . . may, upon probable cause, take, or cause to be taken, the person into custody and place him or her in a facility designated by the county and approved by the State Department of Mental Health as a facility for 72-hour treatment and evaluation."

polysubstance abuse.  (Id.).  Dr. Adib Bitar stated that Plaintiff's "[p]rognosis [was] good [at the time of release] if the [Plaintiff] abstain[ed] from polysubstance abuse, and continue[d] treatment with Lamictal and outpatient treatment."  (AR 207).

**B.   Plaintiff's History of Substance Abuse**

     Plaintiff testified that he smokes a pack of cigarettes every two days, does not drink, and stopped smoking marijuana when he was sixteen. (AR 21).  Plaintiff stated that he "stopped smoking marijuana because it got [him] in trouble at school a lot."  (Id.).  However, Plaintiff also testified that he had relapsed "a couple times . . . to help [him] calm down. . . ."  (AR 21-22).  Plaintiff noted that "[he] never use[s] [marijuana] anymore because it seems to mess with [his] emotions a lot." (AR 22). Plaintiff testified that the last time he used marijuana was in 2009 when "[he] bought a $10 bag off someone and [his] brother knew and then [Plaintiff] got drunk and the next day [he] just didn't feel right and they put [Plaintiff] in the solitaire lockdown."  (AR 28). In a February 25, 2009 emergency room report "[Plaintiff] admit[ted] to smoking 1 gram of marijuana daily[,] [but] [d]enie[d] all other drug use."  (AR 184, 189).  A February 28, 2009 discharge summary indicated a positive urine test for marijuana.  (AR 205).

     In a case record report from April 20, 2009, Dr. Janik reported positive heroin use and indicated usage of multiple other drugs.  (AR 255).  In his testimony before the ALJ, Plaintiff denied ever using heroin.  (AR 39).  Dr. Janik also stated that Plaintiff's last use of a street drug was cocaine six months prior.  (AR 255).  Dr. Janik noted

that Plaintiff sporadically drank alcohol, was not in a drug rehabilitation program, and did not abuse prescription drugs. (Id.). On June 16, 2009, Dr. Janik noted that Plaintiff "still smokes weed" and "needs [to] stop drugs." (AR 251). On August 11, 2009 Dr. Janik stated that Plaintiff "denie[d] all marijuana - [and Plaintiff] was getting more nervous." (AR 250).

In her psychological evaluation on August 18, 2010, Dr. Campbell reported that "[Plaintiff] drinks a case of alcohol a week," "uses marijuana daily," and "last used methamphetamines six months ago and cocaine two years ago" and she noted heroin and PCP use. (AR 278). Dr. Campbell diagnosed Plaintiff with cannabis dependence. (AR 283).

C.   **Plaintiff And Cathy Wooley's Testimony**

   1.   **Plaintiff**

   Plaintiff testified that he usually sees a doctor "[o]nce every month." (AR 24). Plaintiff stated that he has been a patient of Dr. Janik for a "year and a half maybe." (AR 24). Plaintiff testified that he cannot work due to his mental condition:

   I just don't know when I'm going to burst out or some days I
   just don't want to wake up. I feel, just don't feel like
   going and, I just can't deal with coping with people telling
   me what to do all the time. It's hard for me to do that.

\\
\\

12

(AR 22).  Plaintiff stated that he worked for his father for a few years, but that "[his] father . . . doesn't want [Plaintiff] going to work because of [Plaintiff's] outbursts. [Plaintiff's father] doesn't want [Plaintiff] to be around there."  (AR 22-23).  When asked if he looked for other employment, Plaintiff stated "[y]eah, but I just haven't, I just don't feel like doing it.  I tried but I just can't seem to get on it and do it every day."  (AR 23).  Plaintiff testified that during the day he "swim[s].  Sometimes [Plaintiff] just get[s] real mad. [Plaintiff] just go[es] swimming. [Plaintiff doesn't] know what else to do really."  (AR 23).  Plaintiff further explained that he usually spends "[f]our hours a day" in the pool.  (AR 23).  During the winter, Plaintiff testified that he "[j]ust eat[s] and watch[es] TV and that's about it."  (AR 23).  Plaintiff has not applied for any work at all in the past year.  (AR 26).  Plaintiff further testified:

> It bothers [Plaintiff] that [he] can't go to school and do
> what they ask [him] to do. [Plaintiff] get[s] pissed about
> things [that Plaintiff does not] agree with and [Plaintiff
> has] to do it. [Plaintiff] just [doesn't] want to deal with
> that. That's why [Plaintiff does not] want to get in trouble
> with [him] outbursts so [he] just (inaudible) to even bother.

(AR 25).  Plaintiff stated that he has felt suicidal in the past.  (AR 26).  Plaintiff affirmed that his only symptoms are anger and suicidal thinking.  (AR 27).  Plaintiff testified that he also somewhat has problems with OCD.  (AR 27-28).  Plaintiff also stated that he does not sleep well and that he hears voices everyday.  (AR 28-29).  Plaintiff takes Lamictal and he stated that it improves his condition.  (AR 27).

13

### 2. **Cathy Wooley**

Cathy Wooley, Plaintiff's mother, submitted a Third Party Function Report on May 17, 2009, and testified at the administrative hearing. (AR 31-39, 139-146). Wooley reported that "[Plaintiff] has a very short attention span. [Plaintiff] angers quickley (sic) and sometimes he[']s a danger to himself and others." (AR 139). Wooley noted that Plaintiff "[s]pends time drawing, smoking, arguing with family, naping (sic), and complaining about most everything." (Id.). Wooley stated that "[s]ometimes [Plaintiff] needs [a] reminder to take a shower and to eat." (AR 141). Wooley noted that "[Plaintiff] has to (sic) much rage sometimes" and that "[i]t's like walking on eggshells with [Plaintiff]. You never no (sic) when he[']s going to blow up." (AR 142, 144).

Wooley reported that Plaintiff has difficulty "[c]ompleting tasks, concentrat[ing], following [i]nstructions, and getting along with others . . . [because] of his bipolar [condition.]" (AR 144). Wooley also noted that Plaintiff "[d]oesn't have the patience to read instructions" and that he does "not get a [l]ong (sic) with authority figures" because "[Plaintiff] tends to mouth off." (AR 144-45). Wooley stated that Plaintiff "walked[ed] off [from work] or he was sent home for not getting along with others . . . because of his [l]anguage [and] out bursts." (AR 145).

Wooley testified that she does not currently live with Plaintiff and sees Plaintiff "[a]bout every two days" for ten minutes. (AR 30-31). Wooley stated that she lived with Plaintiff until two months prior to the hearing. (AR 32). Wooley testified that Plaintiff threatens to

14

kill himself "every couple of weeks." (Id.). Wooley stated that Plaintiff has been depressed his whole life. (AR 33). Wooley also testified that "[she didn't] think the counseling helps much," but that the Lamictal "[is] helping [Plaintiff]." (AR 34).

Wooley stated that Plaintiff's most difficult time is in the morning because he has no medicine in his system. (AR 34-35). Wooley noted that "[w]ithin an hour or so [of Plaintiff taking his medicine,] [Plaintiff] calms down[,] but it's just like walking on eggshells with [Plaintiff] all the time." (AR 35). Wooley stated that she has seen Plaintiff "punch his face" and "hit his [own] head on the wall." (Id.). Wooley testified that "[Plaintiff] can't control his anger." (AR 36).

**D.   The Vocational Expert's Testimony**

Abbie May, an impartial vocational expert ("VE"), testified on June 17, 2010. (AR 17-18, 40-43). The ALJ provided the following hypothetical question to the VE: "Assume a hypothetical individual the claimant's age, education, prior work experience or maybe no work experience. Assume this person has no exertional limitations; no work on dangerous machinery; requires a nonpublic setting with limited communication with fellow employees." (AR 41). The VE responded that a person with these limitations "could perform work as, various labor type jobs. A landscape laborer, unskilled . . . This person could also work as a construction laborer, unskilled . . . [or] [t]his person might also work a light occupation such as a laundry worker in the resorts." (AR 41- 42). The ALJ posed a second hypothetical question to the VE: "Assume a hypothetical individual[,] same restrictions [as the first

15

hypothetical above.]  This person would be off task at least 20 percent of the time due to psychological based symptoms." (AR 42).  The VE responded that this additional limitation "would preclude work." (Id.).

## IV.

### THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents him from engaging in substantial gainful activity[2] and that is expected to result in death or to last for a continuous period of at least twelve months.  Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)).  The impairment must render the claimant incapable of performing the work he previously performed and incapable of performing any other substantial gainful employment that exists in the national economy.  Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry.  20 C.F.R. §§ 404.1520, 416.920.  The steps are:

(1)  Is the claimant presently engaged in substantial gainful activity?  If so, the claimant is found not disabled. If not, proceed to step two.

(2)  Is the claimant's impairment severe?  If not, the

---

[2]  Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit.  20 C.F.R. §§ 404.1510, 416.910.

1    claimant is found not disabled.  If so, proceed to step

2    three.

3    (3)  Does the claimant's impairment meet or equal one of a

4         list of specific impairments described in 20 C.F.R. Part

5         404, Subpart P, Appendix 1?  If so, the claimant is

6         found disabled.  If not, proceed to step four.

7    (4)  Is the claimant capable of performing his past work?  If

8         so, the claimant is found not disabled.  If not, proceed

9         to step five.

10   (5)  Is the claimant able to do any other work?  If not, the

11        claimant is found disabled.  If so, the claimant is

12        found not disabled.

13

14   Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari, 262 F.3d

15   949, 953-54 (9th Cir. 2001) (citing Tackett); 20 C.F.R. §§ 404.1520(b)-

16   404.1520(f)(1) & 416.920(b)-416.920(f)(1).

17

18        The claimant has the burden of proof at steps one through four, and

19   the Commissioner has the burden of proof at step five.  Bustamante, 262

20   F.3d at 953-54 (citing Tackett).  Additionally, the ALJ has an

21   affirmative duty to assist the claimant in developing the record at

22   every step of the inquiry.  Id. at 954.  If, at step four, the claimant

23   meets his burden of establishing an inability to perform past work, the

24   Commissioner must show that the claimant can perform some other work

25   that exists in "significant numbers" in the national economy, taking

26   into account the claimant's residual functional capacity,[3] age,

27   _____

28        [3]   Residual functional capacity is "what [one] can still do
     despite [his] limitations" and represents an "assessment based upon all

                                    17

1  education, and work experience.   Tackett, 180 F.3d at 1098, 1100;

2  Reddick, 157 F.3d at 721; 20 C.F.R. §§ 404.1520(f)(1), 416.920(f)(1).

3  The Commissioner may do so by the testimony of a vocational expert or

4  by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R.

5  Part 404, Subpart P, Appendix 2 (commonly known as "the Grids").

6  Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001) (citing

7  Tackett).   When a claimant has both exertional (strength-related) and

8  nonexertional limitations, the Grids are inapplicable and the ALJ must

9  take the testimony of a vocational expert.   Moore v. Apfel, 216 F.3d

10  864, 869 (9th Cir. 2000) (citing Burkhart v. Bowen, 856 F.2d 1335, 1340

11  (9th Cir. 1988)).

12

13                                **V.**

14                        **THE ALJ'S DECISION**

15

16       The ALJ employed the five-step sequential evaluation process

17  discussed above.   At the first step, the ALJ indicated that Plaintiff

18  had not engaged in substantial gainful activity since April 27, 2009,

19  the application date.   (AR 11).   Second, the ALJ found that Plaintiff

20  suffers from mood disorder, marijuana dependence, and alcohol

21  dependence.   (Id.).   At the third step, the ALJ found that "[Plaintiff

22  did] not have an impairment or combination of impairments that [met] or

23  medically [equaled] one of the listed impairments in 20 CFR Part 404,

24  Subpart P, Appendix 1."   (Id.).   In the fourth step of his analysis, the

25  ALJ incorporated the limitations prescribed by the vocational expert and

26

27

28

of the relevant evidence."   20 C.F.R. §§ 404.1545(a), 416.945(a).

the medical record in formulating Plaintiff's residual function capacity:

> After careful examination of the entire record, [the ALJ found] that [Plaintiff] has the residual function capacity to perform a full range of work at all exertional levels[,] but with the following nonexertional limitations: [Plaintiff] is limited to work in a non-public setting and should have limited interaction with coworkers and supervisors. [Plaintiff] should not work around moving or dangerous machinery because of his substance abuse.

(AR 12). The ALJ noted that he "[gave] very limited weight to [the] check sheet from Dr. Janik because it is not consistent with or supported by the other medical evidence including Dr. Janik's own treatment records." (AR 13) The ALJ instead noted that he "[gave] great weight to the assessment of the psychological consulting examiner." (Id.).

With respect to Plaintiff's testimony, the ALJ "found that [Plaintiff's] allegations about his impairments [were] not fully credible . . . . In general, [the ALJ noted that Plaintiff's] statements concerning the intensity, persistence and limiting effects of his symptoms [were] credible only to the extent that they [were] consistent with the . . . residual functional capacity assessment." (AR 14). Further, the ALJ "considered the Third Party Function Report form completed by Cathy Wooley, mother of [Plaintiff], dated May 17, 2009. . . . Ms. Wooley state[d] that [Plaintiff's] activities [were] very

1   limited due to his mental impairments.  Although the mother [was]
2   obviously concerned about [Plaintiff's] well-being, she [was] not a
3   medical professional or otherwise qualified to diagnose severe
4   impairments or to assess their effect on [Plaintiff's] ability to
5   perform work-related activities. [The ALJ] [t]herefore [gave] very
6   little probative weight to the Third Party Function Report." (Id.).

8        The ALJ found that "[Plaintiff] is unable to perform any past
9   relevant work[,]" but that Plaintiff "is capable of making a successful
10  adjustment to other work that exists in significant numbers in the
11  national economy."  (AR 14-15).   The ALJ therefore concluded that
12  Plaintiff is not disabled.  (AR 15).

14                              **VI.**
15                        **STANDARD OF REVIEW**

17       Under 42 U.S.C. § 405(g), a district court may review the
18  Commissioner's decision to deny benefits.  The court may set aside the
19  Commissioner's decision when the ALJ's findings are based on legal error
20  or are not supported by substantial evidence in the record as a whole.
21  Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001) (citing
22  Tackett, 180 F.3d at 1097); Smolen v. Chater, 80 F.3d 1273, 1279 (9th
23  Cir. 1996) (citing Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1989)).
24  "Substantial evidence is more than a scintilla, but less than a
25  preponderance." Reddick, 157 F.3d at 720 (citing Jamerson v. Chater,
26  112 F.3d 1064, 1066 (9th Cir. 1997)).  It is "relevant evidence which
27  a reasonable person might accept as adequate to support a conclusion."
28  Id. (citing Jamerson, 112 F.3d at 1066; Smolen, 80 F.3d at 1279).  To

                                  20

1   determine whether substantial evidence supports a finding, the court
2   must "'consider the record as a whole, weighing both evidence that
3   supports and evidence that detracts from the [Commissioner's]
4   conclusion.'"  <u>Aukland</u>, 257 F.3d at 1035 (citing <u>Penny v. Sullivan</u>, 2
5   F.3d 953, 956 (9th Cir. 1993)).  If the evidence can reasonably support
6   either affirming or reversing that conclusion, the court may not
7   substitute its judgment for that of the Commissioner.  <u>Reddick</u>, 157 F.3d
8   at 720-21 (citing <u>Flaten v. Sec'y</u>, 44 F.3d 1453, 1457 (9th Cir. 1995)).

10                                **VII.**
11                             **DISCUSSION**

13       Plaintiff contends that remand is required because the ALJ: (1)
14   improperly considered the opinions of Consultative Examiner Robin
15   Campbell and (2) improperly discredited Wooley's Third Party Function
16   Report.  (Memorandum in Support of Complaint ("Compl. Mem." at 2-7)).[4]
17   The Court finds that remand is not required based upon these claims.

19   **A.   <u>The ALJ Properly Considered the Opinion of Robin Rhodes Campbell</u>**

21       Plaintiff argues that while the "ALJ [gave] 'great weight' to Dr.
22   Campbell's opinions[,] [the ALJ] overlooked [Dr. Campbell's] opinion
23   about stress."  (Compl. Mem. at 2).  "Although [the ALJ] credited Dr.

25   _____
26       [4]   The Court notes that Plaintiff does not contest the ALJ's
     treatment of Dr. Janik's findings, nor the ALJ's rejection of
27   Plaintiff's credibility.  (<u>See</u> Compl. Mem. at 2-7).  Plaintiff instead
     limits his contentions to (A) the ALJ's treatment of Consultative
28   Examiner Robin Campbell's report and (B) the ALJ's rejection of the
     Third Party Testimony by Cathy Wooley.  (<u>See</u> <u>id.</u>).

Campbell generally, [the ALJ] did not even mention Dr. Campbell's opinion about stress. [The ALJ] thereby implicitly denied it [and] [b]y so doing, the ALJ erred." (Id.). Plaintiff further noted that "Dr. Campbell's observation about stress corroborates the lay observations of Cathy Wooley . . . who indicated that Plaintiff could not deal with stress and in fact would sometimes react to it by violence." (Id. at 4). The Court disagrees.

Here, Plaintiff's allegation that the ALJ erred in overlooking Dr. Campbell's opinion about stress is without merit. Dr. Campbell examined Plaintiff at the Agency's request. (See AR 42-43, 276). As noted above, Dr. Campbell diagnosed Plaintiff with cannabis dependence and mood disorder. (AR 283). Dr. Campbell also noted that unemployment is a psychosocial stressor for Plaintiff. (Id.). With respect to stress, Dr. Campbell noted that "[Plaintiff's] ability to withstand the stress and changes associated with an eight-hour workday and day-to-day work activities [was] mildly to moderately impaired." (Id.).

The record refutes Plaintiff's claim that the ALJ failed to properly consider or discuss Dr. Campbell's findings with respect to Plaintiff's stress levels. In his discussion of Dr. Campbell's opinion, the ALJ specifically noted that Dr. Campbell reported that "[Plaintiff] would have mild to moderate impairment dealing with workday stresses and changes and moderate to marked difficulty relating to the public, supervisors, and coworkers." (AR 13). After considering Dr. Campbell's opinion, as well as the remaining medical evidence, the ALJ included certain mental limitations in Plaintiff's residual function capacity. Specifically, the ALJ included "the following nonexertional limitations:

22

1 [Plaintiff] is limited to work in a non-public setting and should have
2 limited interaction with coworkers and supervisors. [Plaintiff] should
3 not work around moving or dangerous machinery because of his substance
4 abuse." (AR 12). Further, in his hypothetical to the VE, the ALJ
5 included these limitations: "no work on dangerous machinery; requires
6 a nonpublic setting with limited communication with fellow employees."
7 (AR 41). Thus, the Court concludes that the ALJ properly assessed
8 Plaintiff's RFC and included limitations suggested by Dr. Campbell's
9 August 18, 2010 psychological evaluation. Plaintiff's claim that the
10 ALJ failed to consider Dr. Campbell's opinion with respect to
11 Plaintiff's stress level is undermined by the record.

12

13 Moreover, Dr. Campbell's findings do not support Plaintiff's claims
14 of disability. As noted, Dr. Campbell found that "[Plaintiff's] thought
15 processes were linear and goal-directed with no loosening of
16 associations, flight of ideas, racing thoughts, thought blocking,
17 thought insertion, withdrawal or broadcasting." (AR 279). Further, Dr.
18 Campbell noted that "[Plaintiff] exhibited no evidence of auditory or
19 visual hallucinations, delusions, or illusions. There were no
20 obsessions, compulsions, or paranoia. [Plaintiff] denied current
21 suicidal or homicidal ideation, plan or intent." (Id.). Dr. Campbell
22 stated that "[Plaintiff] was alert and oriented to person, place, time,
23 and situation. [Plaintiff] did not present with obvious cognitive
24 delays." (Id.) In terms of Plaintiff's ability to concentrate, Dr.
25 Campbell stated that "[Plaintiff's] attention was unimpaired" and
26 "[Plaintiff's] concentration was adequate for conversation and time-
27 limited assessment tasks." (Id.). In addition, Dr. Campbell found
28 that "[Plaintiff's] insight and judgment were good. [Plaintiff]

1    demonstrated no impairment in social and common sense understanding."

2    (Id.).  Furthermore, Dr. Campbell noted that "[t]he [Plaintiff] would

3    have no impairment in understanding, remembering, and carrying out

4    short, simple instructions.  In addition, [Plaintiff's] ability to

5    understand, remember, and carry out detailed instructions would be

6    unimpaired. [Plaintiff] would be unimpaired in his ability to make

7    judgment on simple, work-related decisions." (AR 283).  These findings

8    support the ALJ's RFC determination.

9

10       Furthermore, Dr. Campbell's assessment is corroborated by the

11   findings of Dr. Paxton and Dr. Bitar.  In his functional capacity

12   assessment, Dr. Paxton stated that "[Plaintiff] is able to understand

13   and remember simple but not detailed tasks[;] [Plaintiff] is able to

14   maintain concentration, pace and persistence over a normal work day and

15   work week[;] [Plaintiff] should have limited public contact[;] and

16   [Plaintiff] is able to adapt to normal work environment and situations."

17   (AR 216).  After Plaintiff's 5150 hold, Dr. Adib Bitar noted that

18   Plaintiff's "[p]rognosis [was] good [at the time of release] if the

19   [Plaintiff] abstain[ed] from polysubstance abuse, and continue[d]

20   treatment with Lamictal and outpatient treatment."  (AR 207).

21

22       Even if the ALJ should have considered additional non-exertional

23   limitations, this consideration would have only led to a slight

24   modification of the RFC, and therefore any error was harmless error.

25   See Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1162 (9th Cir.

26   2008) (if ALJ's error was inconsequential to the ultimate nondisability

27   \\

28   \\

1    determination, no remand required); <u>Burch v. Barnhart</u>, 400 F.3d 676, 679

2    (9th Cir. 2005) ("A decision of the ALJ will not be reversed for errors

3    that are harmless.").   No remand is required.

4

5    **B.   <u>The ALJ Properly Rejected Wooley's Third Party Statement</u>**

6

7         Plaintiff also argues that the "ALJ did not give a reason germane

8    to Ms. Wooley for rejecting her written report." (Compl. Mem. at 5).

9    Specifically, Plaintiff contends that the "ALJ erred in rejecting Ms.

10   Wooley's testimony on the ground that she did not have the medical

11   expertise necessary to offer such observations." (<u>Id.</u> at 6).  Plaintiff

12   further argues that the ALJ's rationale "is a categorical statement that

13   could apply to most if not all lay witnesses.  It is also inaccurate:

14   Ms. Wooley did not attempt to diagnose a condition. [Ms. Wooley] merely

15   reported relevant observations of symptoms and limitations that affect

16   Plaintiff's ability to work."  (<u>Id.</u> at 5). While the Court agrees that

17   the reason provided by the ALJ was a reason that would be germane to

18   many lay witnesses, and therefore is arguably not a proper reason for

19   rejecting Wooley's testimony, the Court finds that such error was

20   harmless error here.

21

22        The ALJ stated that he "considered the Third Party Function Report

23   form completed by Cathy Wooley, mother of the claimant, dated May 17,

24   2009.  Ms. Wooley state[d] that [Plaintiff's] activities are very

25   limited due to his mental impairments. Although the mother is obviously

26   concerned about [Plaintiff's] well-being, she is not a medical

27   professional or otherwise qualified to diagnose severe impairments or

28   to assess their effect on [Plaintiff's] ability to perform work-related

activities.  Therefore, [the ALJ gave] very little probative weight to the Third Party Function Report."  (AR 14).

The ALJ is required to consider the credibility of lay testimony concerning a plaintiff's ability to work.  <u>Bruce v. Astrue</u>, 557 F.3d 1113, 1115 (9th Cir. 2009).  If an ALJ rejects lay witness testimony, the ALJ must provide specific reasons that are germane to each witness whose testimony he rejects.  <u>Id.</u> (citing <u>Stout v. Comm'r, Soc. Sec. Admin.</u>, 454 F.3d 1050, 1054 (9th Cir. 2006)); <u>see also</u> <u>Carmickle</u>, 533 F.3d at 1164 (noting that an ALJ need only provide reasons "germane to [the] witness" for rejecting lay witness testimony).  An ALJ need not discuss "medical <u>diagnoses</u>" made by lay witnesses because they "are beyond the competence of lay witnesses and therefore do not constitute competent evidence."  <u>Nguyen v. Chater</u>, 100 F.3d 1462, 1467 (9th Cir. 1996) (citing 20 C.F.R. § 404.1513(a)).  "However, lay witness testimony as to a claimant's symptoms or how an impairment affects ability to work <u>is</u> competent evidence, and therefore <u>cannot</u> be disregarded without comment."  <u>Id.</u> (internal citations omitted).

Wooley submitted a Third Party Function Report on May 17, 2009 and testified at the administrative hearing.  (AR 31-39, 139-146).  With respect to Plaintiff's medical condition, Wooley reported that Plaintiff has difficulty "[c]ompleting tasks, concentrat[ing], following [i]nstructions, and getting along with others . . . [because] of his bipolar [condition.]" (AR 144).  Wooley also noted that Plaintiff "[d]oesn't have the patience to read instructions" and that he does "not get a [l]ong (sic) with authority figures" because "[Plaintiff] tends to mouth off."  (AR 144-45).  Wooley stated that Plaintiff "walked[ed]

26

off [from work] or he was sent home for not getting along with others
. . . because of his [l]anguage [and] outbursts." (AR 145). Wooley
testified that Plaintiff has been depressed his whole life. (AR 33).
Wooley also stated that "[she didn't] think the counseling helps much,"
but that the Lamictal "[was] helping [Plaintiff]." (AR 34).

Here, the ALJ expressly considered Wooley's statements. (See AR
14). Wooley offered her opinions as to how Plaintiff's mental condition
affected Plaintiff's ability to concentrate and work. (See AR 144).
While the reason given for rejecting her testimony was a reason that was
germane to the witness, i.e., she was not a medical professional, it was
a reason that would be germane to most lay witnesses. The Court agrees
that the ALJ's proferred reason was not a legitimate reason to reject
a lay witnesses' testimony.

However, such error was harmless error because the decision remains
legally valid. See Keyser v. Commissioner Social Sec. Admin., ___ F.3d
___, 2011 WL 2138237, at * 6 (9th Cir. June 1, 2011) ("an error
'inconsequential to the ultimate nondisability determination' is
harmless") (quoting Stout, 454 F.3d at 1055). Wooley's testimony was
merely cumulative of Plaintiff's own testimony, which was properly
rejected. Even if the ALJ should have given greater weight to Wooley's
report and testimony, this consideration would have only led to a slight
modification of the RFC, and therefore any error was harmless error
because the ALJ would have continued to find Plaintiff not entitled to
benefits. No reasonable ALJ would have reached a different decision
based upon this evidence, even if Wooley's statements were fully
credited. See Stout, 454 F.3d at 1056 ("[Where the ALJ's error lies in

1  a failure to properly discuss competent lay testimony favorable to the
2  claimant, a reviewing court cannot consider the error harmless unless
3  it can confidently conclude that no reasonable ALJ, when fully crediting
4  the testimony, could have reached a different determination.").

6       The Court finds that the ALJ's conclusion that Plaintiff can
7  perform work with certain nonexertional limitations is supported by
8  substantial evidence in the record.  Accordingly, no remand is required.

**VIII.**

**CONCLUSION**

      Consistent with the foregoing, IT IS ORDERED that Judgment be
entered AFFIRMING the decision of the Commissioner and dismissing this
action with prejudice.  IT IS FURTHER ORDERED that the Clerk of the
Court serve copies of this Order and the Judgment on counsel for both
parties.

DATED: August 4, 2011

                              _____/S/_____
                              SUZANNE H. SEGAL
                              UNITED STATES MAGISTRATE JUDGE

28